**J. J. EXON, Plaintiff,**

v.

**Norbert T. TIEMANN, as Governor of the State of Nebraska and as a Member of the State Board of Election Canvassers of the State of Nebraska; et al., Defendants (two cases).**

**Civ. 1268L, 1323L.**

United States District Court
D. Nebraska.

Feb. 1, 1968.

See also D.C., 279 F.Supp. 603.

Norman Krivosha, and Patrick Healey, Lincoln, Neb., for plaintiff.

Robert A. Nelson, Sp. Asst. Atty. Gen., Clarence A. H. Meyer, Atty. Gen., Richard H. Williams, Sp. Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., for defendants.

Before LAY, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

## MEMORANDUM

PER CURIAM.

Two cases, both relating to congressional redistricting, are before the court. The questions, except for the jurisdictional question in Civil 1268L, namely, whether the court has authority under the Federal Rules of Civil Procedure, Section 60(b) (6) or through its inherent power, to modify the order of November 22, 1967, are identical in each.

The jurisdictional problem was obviated by plaintiff filing the new action, Civil 1323L, against the defendants named in Civil 1268L and the Attorney General filing an answer instanter for all defendants.

The cases have been combined for trial and argument. This opinion, which will be filed in both cases, will decide all questions excepting only the jurisdictional one, the resolution of which is now unnecessary.

This is the second appearance of Case Civil 1268L. On November 22, 1967 this same court filed an opinion in that case holding invalid the then existing congressional redistricting law of Nebraska. 279 F.Supp. 603.

Since the above opinion, the Congress of the United States (See Exhibit S) by amendment to a private pension bill, in effect prohibited the election at large of Representatives to the Congress in States such as Nebraska.

Two issues are presented, (1) whether or not L.B. 1 passed by the 78th Extraordinary Session of the Nebraska Legislature, is unconstitutional and void, and (2) if L.B. 1 is constitutional, whether this court should make it effective immediately, as requested by defendants, by making it the basis for a redistricting order of the court.

Nebraska has a Unicameral Legislature of 49 members. It was called by the Governor to meet in its 78th Extraordinary Session on January 3, 1968. Among the subjects of the call was congressional redistricting. L.B. 1, above mentioned, being Exhibit G, was considered, as shown by Exhibit B and was given final passage and signed by the Governor on January 11, 1968. With the emergency clause attached it received 31 votes. Without the emergency clause attached it received 34 votes.

All enactments of the Nebraska Unicameral become effective three calendar months after passage unless passed with the emergency clause. Article III, Section 27, Nebraska Constitution. The same constitutional provision requires a two-thirds vote of the members to pass an act with an emergency clause. Thus, 33 votes are needed to make an enactment effective immediately. It is agreed that L.B. 1 becomes effective April 12, 1968.

The Primary Election for the nomination of candidates, including Representatives to the Congress, for the 1968 General Election, will be held May 14, 1968. Under the Nebraska statutes, filings for all offices must be made by March 15, 1968.

Nebraska, based upon the 1960 Census and apportionment, is entitled to three Representatives in the Congress. L.B. 1 divides the State into three Congressional Districts. The practical effect of L.B. 1 is to transfer two counties, Platte and Polk, from the First Congressional District to the Third, and one county, Burt, from the First to the Second District. The record contains evidence as to the population of each Nebraska county and of the districts created by L.B. 1 based upon the 1960 Census, based upon the 1966 population figures developed by the University of Nebraska Bureau of Business Research, of which mention was made in our November 22, 1967 opinion, and based upon the 1967 projected population, as determined by James Dunlevy of the Legislative Research Bureau.

The 1967 Legislative Research Bureau projection is purely mathematical. It is a computation made by applying to the 1966 Bureau of Research figures the average yearly percentage of gain or loss in each county based upon the gain or loss during the preceding six years which it

is stated "in most cases corresponds fairly closely to the average yearly gain or loss between 1950 and 1960" (Page 29, Exhibit B).

Based upon the 1960 Bureau of Census figures, the population of each District as created by L. B. 1 is:

District Number 1 ...................... 489,113
District Number 2 ...................... 414,887
District Number 3 ...................... 507,330  (See Exhibit J)

Based upon the 1966 University of Nebraska estimate, the population is:

District Number 1 ...................... 512,446
District Number 2 ...................... 494,768
District Number 3 ...................... 508,830  (See Exhibit J)

Based upon the 1967 Legislative Research Bureau projection, the population is:

District Number 1 ...................... 514,220
District Number 2 ...................... 508,079
District Number 3 ...................... 508,967  (See Exhibit B)

———◆———

Plaintiff claims L.B. 1 is invalid because the Legislature could have created three districts, each of which, mathematically, could have been more nearly exact in population. Plaintiff offered in evidence Exhibits O, P and Q as representing districts with less population disparity than L.B. 1 and listed on Exhibit R, which was received in evidence, thirty-four additional variations which would have afforded closer mathematical exactness for the three districts than is afforded by L.B. 1.

Counsel for plaintiff expressly disclaim that L.B. 1 results in or from gerrymandering or that politics or other improper motives guided the legislative decision. The claim can really be reduced to "they could have done better." Exhibit R indicates that the changes proposed under item number 3 of the Exhibit would create three districts with the least difference in population between the smallest and largest districts, namely, 2,822 persons.

No reason has been advanced by counsel for defendants for the adoption of the plan embodied in L.B. 1 over any of the other possible plans except to say that it was the plan that mustered enough votes to carry and that the variance that exists is "*de minimis*."

While the legislative history indicates that some legislators favored L.B. 1 because of the 1967 research projection, the Attorney General voiced a reluctance to justify L.B. 1 on this basis.

We are thus faced with deciding whether a plan of redistricting can be constitutional which mathematically is not the most exact plan which could be suggested, and which appears to have no advantages over other suggested "*de minimis*" redistricting plans except that of its ability to secure the votes necessary for passage.

Citation of authority beyond Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), that substantial equality of population is required among the Congressional Districts in any state, is no longer needed. The "one person, one vote" principle is now sufficiently well established to be called "hornbook law."

The question in this, as in most redistricting cases, is whether the complained of enactment provides the required substantial equality of population thus allowing "nearly as is practicable

one man's vote in a congressional election is to be worth as much as another's." Wesberry v. Sanders, 376 U.S. 1, 8, 84 S.Ct. 526 (1964).

Plaintiff in approaching the problem argues that the word "practicable" should be interpreted to mean "possible" when applied to redistricting plans. He argues that the plan which the Legislature considered most practicable would have to be the most precise plan mathematically possible and that a plan such as L.B. 1, which is not the most precise plan mathematically possible, should be held unconstitutional unless the defendants justified the deviation.

Representative bodies must always act in the public interest and in redistricting matters must make an honest effort to achieve mathematical precision. However, mathematical precision can seldom, if ever, be achieved. This is true even if county lines are not followed. We are told in this case that even the United States Census figures are not free from error. The Attorney General argues that according to figures released by the Bureau of Census, approximately five million persons were not enumerated in 1960. If this estimate is correct, then the census was in error by approximately 3%. Of this five million not enumerated it is estimated that three million were white and two million non-white. Mention is made of this fact because with the small non-white population in Nebraska, it is likely that the margin of error is less than 3% in Nebraska. The director of the Bureau of Business Research of the University of Nebraska in his testimony indicated that the Bureau's 1966 estimate could be in error by as much as 3%.

In apportioning the 435 Representatives in the Congress to the States, the basis was one Representative for each 410,481 of population. Nebraska, with a population of 1,411,330, was apportioned three Representatives. The Nation's population in 1960 was 179,323,175. Thus, in Nebraska, there are 179,887 people, or 12.7% of its population who, it could be argued, are not fully represented in the Congress, though they receive the representation the Constitution provides.

Mention is made of these variations, not that we would justify variations in Congressional Districts of 12.7% but because we believe that in determining what is de minimis, and in applying that doctrine and measuring it against the principle of one person, one vote, we must recognize that the states do not and can not have exact mathematical representation in the Congress. For a court to demand of a legislative body fixing Congressional District boundaries under such circumstances, complete mechanical exactness is unrealistic.

We believe that all that is required under the teachings of the United States Supreme Court cases dealing with congressional redistricting is that the variances be slight and justifiable. If the variances are slight, that in itself may be a justification for any plan that has not been reached by improper motive.

Based upon the 1967 projections, the largest district is .74% above median; the smallest district is .46% below the median. The remaining district is but .28% below the median.

Based on the 1966 Bureau of Business Research figures, the largest district is 1.44% above the median and the smallest district 2.09% below the median. The remaining district is approximately .66% above the median. We regard these variances as slight under the evidence before us. We conclude that the de minimis doctrine applies and that its application is not limited to situations where the most nearly mathematically exact districts have been created and the question is whether the disparity between such districts is de minimis. We conclude that if the disparity is de minimis that the courts, applying the "rule of reason" should approve an enactment such as L.B. 1 where the Legislature has properly maintained the integrity of political subdivisions and has recognized natural or historical boundary lines or similar considerations in giving final approval to its enactment,

and has not been influenced by improper motive.

Whether the Legislature relied upon the 1967 projection or upon the 1966 University of Nebraska figures, is immaterial since we conclude that the districts, as created by L.B. 1 fall within the standards approved by the Supreme Court of the United States. Its most recent order in Gong v. Kirk, (U.S.D.C. So.Fla. decided below August 2, 1967 and September 27, 1967, 278 F.Supp. 133, and affirmed in the U.S. Supreme Court January 15, 1968) supports this view. See 389 U.S. 574, 88 S.Ct. 695, 19 L.Ed.2d 784. From the three-judge opinion outlining the reasons for the order which the Supreme Court affirmed it appears that the District Court created congressional districts with a maximum deviation of .74% above and 1.20% below the population of the average perfect district. The court plan was based upon a calculation of each voting precinct's population made by determining the ratio, based on the most recent voter registration figures of registered voters in each voting precinct to the total registered votes of the county and applying that ratio to the couny population as shown by the 1960 Census. The United States Supreme Court by its affirmance approved at least an ad hoc application of making calculations as to existing population rather than using the 1960 Census figures, and approved deviations of nearly 2% between the largest and smallest districts.

It is the conclusion of the court that L.B. 1 does not violate the one person, one vote standard to the extent that plaintiff is deprived of his constitutional rights.

The next question to be answered results from the passage of L.B. 1 without making it immediately effective.

The 1968 Primary election in Nebraska will be held on May 14. The last date for filings under State law is March 15. L.B. 1 becomes effective April 12. Thus, if it is necessary in creating a valid enactment that the bill create districts which are in actual and legal existence on March 15, then L.B. 1 is lacking.

Primaries are of relatively recent origin considering the life span of the Republic. Prior to the Primary system, nominations for Representatives were regularly made by the political parties in conventions. That system is still used in some states. It is not necessary to the validity of an election that a candidate for Representative be nominated in a Primary. Nebraska statutes provide for nominations by party representatives under certain named conditions.

All Representatives are elected under the laws of the United States. Nebraska has recognized this in Section 5–102, Revised Statutes, Nebraska, 1943 (Reissue, 1962). States have no authority to add qualifications to those set forth in Article I, Section 2, Clause 2 of the United States Constitution which reads:

> "No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."

Judge Edward Dumbauld, in his work "The Constitution of the United States" after giving the history of the clause just quoted, says:

> "It should be noted that there is no legal requirement that a member of Congress be a resident of the particular congressional district which he represents." (p. 67)

There being no such requirement in the Constitution itself, a state cannot require that a Representative live in the District from which he was nominated. See Hellmann v. Collier, 217 Md. 93, 141 A.2d 908.

While it is true that the Constitutional provisions relating to the integrity of elections apply to Primaries (See United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368) and the "one person, one vote" principle applies in Primaries as well as General Elections, it does not follow that L.B. 1

is unconstitutional because its effective date is after the date has passed for Primary filings.

 Any person qualified for the Congress under the clause above quoted, can file in any Nebraska District by designating the number of the District from which he wishes to be elected. Specifically, any person qualified under clause 2 above, residing in Platte, Polk or Burt counties, can file for the Congress in any Nebraska District, such person desires, and the right to do so is not impaired by L.B. 1. The right to vote for nominees to the Congress will be afforded all qualified electors of the three counties named, on May 14. Plaintiff will likewise have the right to vote for his Party's nominee for the Congress in the Congressional District in which on May 14 he is a qualified elector. We cannot see how, as a result of L.B. 1, plaintiff has lost, or will lose, when he presents himself to vote on May 14, 1968, any right which he has under the Constitution of the United States.

The Attorney General argues that the Secretary of State can accept a filing in any district whether the boundaries of the Congressional Districts are changed after the filing is made or not. We are not ready to say that his position is erroneous or that advice to the Secretary of State, which it appears he proposes to give, to notify the county clerks and election commissioners of the Congressional filings in the districts as created by L.B. 1, and to print ballots for distribution in the districts as created by L.B. 1 would be erroneous. It is certain that the districts will be validly created at the time the elector casts his vote at the Primary. We therefore conclude that L.B. 1 in no manner impinges on the vote of plaintiff or any other elector in failing to have an emergency clause attached.

We further conclude that the effective date of L.B. 1 was a legislative matter and that failure to make it effective immediately does not invalidate the constitutional rights of plaintiff or other electors.

The Attorney General urges that we give L.B. 1 sanction as a "court bill." We are unwilling to do this, for reasons that need not be enumerated. We do not care to designate as a "court bill" a bill which we did not draft. We only hold that the failure to pass the bill with the emergency clause is not such an invasion of the rights of plaintiff or any other elector under the doctrine of one person, one vote as to make it invalid under the facts before us.

This opinion will stand as the court's findings of fact and conclusions of law in case Civil 1323L and since it effectively disposes of the necessary issues in Civil 1268L, it will be filed in that case also. A separate order will be entered adjudging L.B. 1 as passed by the 78th Extraordinary Session of the Nebraska Legislature to be a valid enactment, dismissing plaintiff's complaint, and declining as a court to apportion or divide the State into Congressional Districts as provided in L.B. 1 as requested by the defendants.